IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| SYLVIA HARRISON and JOE PARKER, ) | |
| ) | |
| Plaintiffs, ) | Case No. |
| ) | |
| v. ) | Judge |
| ) | Magistrate Judge |
| VALLEY PACKAGING CORPORATION, ) | |
| ) | Jury Demand |
| Defendant. ) | |

## COMPLAINT

For their Complaint against Defendant Valley Packaging Corporation ("Defendant"), Plaintiffs Sylvia Harrison ("Ms. Harrison") and Joe Parker ("Mr. Parker") (collectively "Plaintiffs") state:

### PARTIES

1. Ms. Harrison and Mr. Parker formerly worked for Defendant as Customer Service Manager and Production Manager, respectively, at its manufacturing facility in Pulaski, Tennessee.

2. Defendant is a Tennessee corporation with its principal place of business at 2431 Minor Hill Highway, Pulaski, Tennessee 38478. Defendant may be served with process through its registered agent, CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919.

3. Defendant operates a container manufacturing facility within the Middle District of Tennessee. At all relevant times, Defendant employed more than 100 individuals.

### JURISDICTION AND VENUE

4. This is an action for equitable relief and damages for unlawful employment practices brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e, *et seq*. ("Title VII"). The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4). Venue is proper under 28 U.S.C. § 1391.

5. Plaintiffs have met all conditions precedent to the filing of this Complaint. They each timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on February 21, 2019. The EEOC mailed each of them a Notice of Right to Sue on October 29, 2019.

## FACTS

6. Ms. Harrison and Mr. Parker worked for Defendant for 28 and 25 years, respectively. For the last 18-plus years of their employment, Ms. Harrison worked as Customer Service Manager and Mr. Parker worked as Production Manager. Defendant discharged both on October 29, 2018.

7. Ms. Harrison and Mr. Parker performed their jobs in an excellent manner, continuously received pay raises and bonuses throughout their employment, and never received any disciplinary action from Defendant.

8. As Customer Service Manager, Ms. Harrison handled customer inquiries and orders in an excellent manner, as evidenced by her long tenure in the position, her evaluations and compensation, and customer satisfaction. Ms. Harrison often worked after hours and on weekends to provide superior customer service. She had a 99 to 100% on time quote rate. She was repeatedly praised for her performance by her supervisors. She received few if any customer complaints and her numerous customers were happy with her and the services she provided.

9. As Production Manager, Mr. Parker managed Defendant's production facility in an excellent manner, as evidenced by his long tenure in the position, his evaluations and

compensation, and the many production and profit records he and his team set. Over the last seven years of his employment, Mr. Parker received 27 consecutive quarterly bonuses, including a $20,000 bonus shortly before Defendant discharged him. In 2018, Defendant experienced some of its most successful production months in company history under his leadership. In August, September, and October 2018, its "defective parts per million" figures, a key measurement of success, were outstanding. Defendant repeatedly praised Mr. Parker for his performance.

10. In several meetings in 2017 and early 2018, Defendant's Plant Manager or General Manager, Ron Galyon, told Mr. Parker that he wanted him to be the company's next General Manager.

11. Further, in 2017 Defendant informed Mr. Parker that it was going to send him to General Manager training sessions in Gettysburg, Pennsylvania, so that he could become its next General Manager.

12. Additionally, Vice President Randy Hearon repeatedly told Mr. Parker that Mr. Galyon was not well suited to make effective decisions for the plant and that Mr. Parker was better suited to lead the operation.

13. Upon information and belief, Defendant's performance and profits have declined since it discharged Plaintiffs.

14. During their employment Ms. Harrison and Mr. Parker learned that General Manager Galyon was engaging in sex-based discriminatory conduct toward subordinate female employees. Specifically, Mr. Galyon frequently drove around the factory floor on a golf cart, slowed or stopped the cart, and deliberately circled around female employees and inappropriately

ogled, stared at, leered at and/or engaged in intimidating conduct toward them, specifically because of their sex.

15. For example, Mr. Galyon would repeatedly watch young female employees bend over while wearing shorts and make comments or inappropriately ogle and stare at them for excessive periods of time. He did not engage in such conduct toward any male employees.

16. Mr. Galyon abused his position of authority in treating female employees on the floor in the manner described above. Several employees saw him engage in sex-based discriminatory behavior. Many were afraid to report it because he was the General Manager and because of the way he held himself out and conducted himself in the workplace.

17. In or about the spring of 2018, Mr. Parker observed Mr. Galyon circling his golf cart around, stopping, and inappropriately ogling and staring at an 18 year-old female employee for an excessive period of time. The young female employee was wearing shorts and bending over to pick up items on the factory floor and go through sheets of corrugated material. This incident was witnessed by and negatively commented upon by multiple other employees, some of whom reported it to Ms. Harrison and Mr. Parker. The female employee heard about Galyon's conduct from co-workers but felt intimidated and afraid to report it.

18. In observing the sex-based discriminatory conduct, Mr. Parker believed that Galyon had "crossed the line," in part because he has a daughter around the same age as the young female employee. Consequently, he reported Galyon's conduct to Defendant's Human Resources Manager, Barry Taylor.

19. Mr. Parker and other employees made Mr. Taylor aware of the identity of the young female employee Galyon had circled around, stopped and stared at because of sex and the

identities of other employees who had seen Galyon engaging in such conduct on this and other occasions.

20. Mr. Taylor did not investigate or take any preventative, corrective or remedial action in response to Mr. Parker's reports regarding Galyon's workplace conduct.

21. Mr. Taylor told Mr. Parker that he could not do anything about Galyon's conduct because he was subordinate to Galyon.

22. Both Ms. Harrison and Mr. Parker also reported Mr. Galyon's discriminatory conduct to Vice President Randy Hearon, who along with Galyon was a member of Defendant's executive leadership team.

23. Mr. Parker made Mr. Hearon aware of the identity of the young female employee Galyon had circled around, stopped and stared at because of sex and the identities of other employees who had seen Galyon engaging in such conduct on this and other occasions.

24. Ms. Harrison stated to Hearon that it was difficult for employees to "get on the energy bus" (referring to a book Defendant had its employees read called *The Energy Bus*) when Galyon was openly engaging in such demeaning conduct toward female employees.

25. Mr. Hearon was further aware of other complaints about Galyon circling local parking lots in his vehicle, ogling and staring at females because of sex, and engaging in other sex-based inappropriate conduct toward women.

26. Mr. Hearon did not investigate or take any preventative, corrective or remedial action in response to Plaintiffs' reports to him regarding Galyon's workplace conduct.

27. Mr. Hearon apologized for Galyon's behavior and told Ms. Harrison and Mr. Parker that they would just have to deal with it due to Galyon's position with the company and

5

his close relationship with Bryan Hollenbach, who is Vice President of Defendant's parent company, Green Bay Packaging, Inc.

28. Mr. Galyon was off work on vacation and/or medical leave from or about June through mid-August 2018.

29. When he returned to work in mid-August 2018, Galyon subjected Plaintiffs to severe and pervasive retaliatory harassment and treated them differently than he had before they had reported his conduct to Mr. Taylor and Mr. Hearon. For example, Galyon angrily confronted Mr. Parker about being behind on one order, made threatening statements to him about his job, and followed him to his office and continued to harass him and act inappropriately. He was trying to provoke Mr. Parker, which he had never done before Plaintiffs reported him to Taylor and Hearon. Galyon also started going around Mr. Parker and against company protocol. For example, he gave one of Mr. Parker's employees a raise and screamed at and wrote up another, both without Mr. Parker's knowledge. Galyon further excluded Ms. Harrison and Mr. Parker from management and other meetings in which they had previously been included, among other acts of harassment and retaliation for reporting his behavior.

30. Further, when he returned to work in mid-August 2018, Galyon stated to Mr. Parker on multiple occasions, "We don't need women leading our departments" and specifically referenced Ms. Harrison and a shipping manager who reported to Mr. Parker, Jerri Lynn Kressenberg.

31. Out of approximately 140 employees at Defendant's Pulaski plant, there were no females in upper management, Ms. Harrison was the only female in middle management, and Ms. Kressenberg was the only other female supervisor in the company.

6

32. In or about mid-to-late October 2018, Mr. Hearon told Mr. Parker that Galyon was going to fire him for "not having [Galyon's] back," that Galyon was also going to fire Ms. Harrison, and that "it [was] not going to end well" for them.

33. On October 29, 2018, Defendant discharged Ms. Harrison and Mr. Parker, effective immediately. Galyon told them to gather their belongings and had them escorted out of the building.

34. On October 29, 2018, Plaintiffs each asked Galyon why they were being discharged. Galyon would only respond, "We are going in a different direction." Defendant gave Plaintiffs no other reasons for their discharges.

35. When Galyon discharged Plaintiffs, Vice President Carter Moore was crying or tearful and stated to Mr. Parker that the company would never have been as successful as it was without him.

36. Further, after Plaintiffs had been discharged, Human Resources Manager Taylor confirmed to Mr. Parker that two other employees had also reported Galyon's sex-based discriminatory conduct toward female employees; that he had told Defendant's attorney about the reports from Parker and the other employees; and that he understood that Galyon had terminated Plaintiffs' employment for reporting Galyon's conduct.

37. Defendant replaced Mr. Parker and Ms. Harrison with two other mid-tier male managers, John DeFoe and Bob Peoples, respectively, neither of whom had opposed and reported Galyon's discriminatory conduct.

38. Defendant treated Ms. Harrison differently and less favorably than male employees, including but not limited to Bob Peoples and Clint Burns, whom Defendant's management, department heads, and other employees frequently complained about and called

7

incompetent due to their work performance, communication issues, withholding important information from the customer service department, not following company rules, policies and procedures, and having customer complaints, among other things. It further treated her differently than Carter Moore, who called employees "idiots," threw a pencil at and fired a female employee who was crying, publicly displayed a bad attitude and a volatile temper, created a hostile work environment, treated employees disrespectfully and in violation of company policy, and was the subject of numerous employee complaints. Defendant did not discharge these individuals. Instead, it gave Mr. Peoples Ms. Harrison's former job and promoted Mr. Moore to CFO.

39. Defendant treated Ms. Harrison and Mr. Parker differently and less favorably than employees who had not reported, opposed and refused to remain silent about Galyon's sex-based discriminatory conduct, including those referenced in the preceding paragraph and Quality Manager John DeFoe, who exhibited poor performance, failed to lead the quality team as required and otherwise did not meet company expectations. Defendant did not discharge these individuals and gave Mr. DeFoe Mr. Parker's former job.

40. Defendant discriminated and retaliated against and discharged Ms. Harrison because of sex and/or for reporting, opposing, and refusing to remain silent about Galyon's sex-based discriminatory conduct, in violation of Title VII.

41. Defendant retaliated against and discharged Mr. Parker for reporting, opposing, and refusing to remain silent about Mr. Galyon's sex-based discriminatory conduct, in violation of Title VII.

42. Following Plaintiffs' reports about Galyon's sex-based discriminatory conduct, Defendant failed and refused to take any corrective or remedial action and retaliated against and discharged Plaintiffs because of their opposition to that conduct, in violation of Title VII.

43. Defendant's response to Plaintiffs' reports of discrimination or lack thereof manifested indifference or unreasonableness in light of what it knew and/or reasonably should have known regarding Galyon's conduct and his propensity to engage in such behavior.

44. Defendant's conduct as described in this Complaint was malicious and/or recklessly indifferent to Plaintiffs' federally protected rights, entitling them to punitive damages.

45. As a direct result of Defendant's conduct as described in this Complaint, Plaintiffs lost income and other privileges and benefits of employment; suffered embarrassment, humiliation, emotional distress and anxiety, inconvenience, and loss of enjoyment of life; and incurred attorneys' fees, costs and litigation expenses.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request:

1. A jury trial;

2. Back pay and damages for lost benefits;

3. Compensatory damages for embarrassment, humiliation, emotional distress and anxiety, inconvenience, and loss of enjoyment of life;

4. Reinstatement or, alternatively, front pay and damages for lost benefits;

5. Punitive damages;

6. Attorneys' fees, costs and litigation expenses;

7. Prejudgment interest and, if applicable, post judgment interest; and

8. Such other and further legal or equitable relief to which they may be entitled.

Respectfully submitted,

s/Douglas B. Janney III
Douglas B. Janney III (TN BPR No. 19112)
Law Office of Douglas B. Janney III
2002 Richard Jones Road, Suite B-200
Nashville, Tennessee 37215
(615) 742-5900
doug@janneylaw.com

Attorney for Plaintiffs